IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CHRISTOPHER STEPHEN BECK, | |
| Plaintiff, | 8:16CV193 |
| vs. | |
| SHERIFF DAN OSMOND, Custer County Jail; and PAMELA GOLDSBY, | MEMORANDUM AND ORDER |
| Defendants. | |

This matter is before the court on Defendants' Motion for Summary Judgment. ([Filing No. 31](#).) For the reasons that follow, the Motion is granted.

## I. BACKGROUND

Plaintiff Christopher Stephen Beck ("Beck") filed this action pursuant to [42 U.S.C. § 1983](#) against Defendants Dan Osmond ("Osmond") and Pamela Goldsby[1] ("Goldsby"), asserting that they were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. ([Filing No. 19](#).) Beck alleged that, while confined at the Custer County Jail, Defendants refused his requests to see a doctor for stomach pain that affected his ability to eat and move and caused blood in his stool. (*Id*.) The court allowed Beck's Eighth Amendment claim for monetary damages to proceed against Osmond and Goldsby in their individual capacities. ([Filing No. 20](#).)

---

[1] Beck filed his action against Dan "Osmund" and Pamela "Hunter." Pursuant to Defendants' Answer ([Filing No. 24](#)), the court directed the clerk's office to correct the records in the case to reflect that the sole defendants are Dan Osmond and Pamela Goldsby. (*See* [Filing No. 25](#).)

## II. RELEVANT UNDISPUTED MATERIAL FACTS[2]

1. From August 14, 2014, until November 18, 2014, Beck was confined at the Custer County Jail in Broken Bow, Nebraska, where he awaited extradition to Texas. (Filing No. 32-2 at CM/ECF p. 2.) He had been confined at the Custer County Jail approximately a dozen times before, dating back to 1997. (Filing No. 32-2 at CM/ECF p. 2; Filing No. 32-3 at CM/ECF pp. 1-26.)

---

[2] Beck, a pro se litigant, is "bound by and must comply with all local and federal procedural rules." NEGenR 1.3(g). The court's local rules require the party moving for summary judgment to file a brief containing a "separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." This statement of facts "should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to . . . materials that support the material facts . . . ." NECivR 56.1(a). The opposing party must respond to the moving party's statement of material facts in a brief containing separate numbered paragraphs with citations to supporting references and with identification of material facts that are disputed. NECivR 56.1(b). *See also* NECivR 7.1(b)(2)(A) ("When filing the opposing brief, the opposing party must also file and serve supporting evidentiary material not previously filed."). Properly referenced material facts in the movant's statement of facts are "considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1). The material facts below, appearing in numbered paragraphs, are those that have not been properly disputed pursuant to the court's local rules. Beck opposes some of the material facts set forth by Defendants but mostly through his own allegations of denial rather than through evidentiary support. He also submits inmate request forms already in evidence. The court does consider the facts alleged in Beck's verified Amended Complaint (Filing No. 19). *See Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994-95 (8th Cir. 2001) ("[t]he facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion.") (citations omitted).

2. Osmond has served as Sheriff of Custer County since January of 2011. (Filing No. 32-1 at CM/ECF p. 1.) The Custer County Sheriff's Office oversees the operation of the Custer County Jail. (*Id.*)

3. Goldsby has been the Jail Administrator of the Custer County Jail since 2011. (Filing No. 32-2 at CM/ECF p. 1.) Goldsby, as Jail Administrator, oversees the day-to-day operations. (Filing No. 32-1 at CM/ECF p. 2.) As a result, Osmond is generally not present for or involved in the day-to-day activities at the jail. (*Id.*)

4. Goldsby is personally involved in supervising inmates during her shifts, and often personally handles and responds to the written request forms submitted by the inmates. (Filing No. 32-2 at CM/ECF p. 5.)

5. The inmate handbook provided to inmates at the Custer County Jail at the time of booking instructs them that if they are experiencing a medical need, they are to alert a member of the jail staff if it is an emergency, or if not an emergency, complete and submit a standard written request form which they may designate as "medical" in nature. (Filing No. 32-2 at CM/ECF p. 3; Filing No. 32-3 at CM/ECF p. 138.)

6. At all pertinent times, non-emergency medical needs of inmates confined at the Custer County Jail were addressed during normal business hours through on-call physicians at the Broken Bow Clinic, P.C. ("BBC"), while emergency or after-hours inmate medical needs were addressed through on-call professional medical staff at the local hospital. (Filing No. 32-2 at CM/ECF pp. 3-5; Filing No. 32-3 at CM/ECF pp. 128-132.) Dr. Shawn Lawrence ("Dr. Lawrence") was typically the physician from BBC who responded to calls from staff at the Custer County Jail. (Filing No. 32-2 at CM/ECF p. 5; Filing No. 32-4 at CM/ECF pp. 1-2.)

7. Dr. Lawrence is very familiar with Beck's medical history. His medical history included acid reflux and related symptoms (chest and stomach and throat burning/pain), which was usually well controlled with over-the-counter or prescription antacids. Beck had no history of stomach ulcers or tumors in 2014. ([Filing No. 32-4 at CM/ECF p. 3](#).)

8. Beck was confined at the Custer County Jail in late 2006 and early 2007. During that time, Dr. Lawrence controlled Beck's acid reflux symptoms with prescription antacid medications, such as Protonix and Prevacid. ([Filing No. 32-3 at CM/ECF pp. 29-36](#); [Filing No. 32-4 at CM/ECF pp. 3-4](#).)

9. During his 2014 confinement at the Custer County Jail, Beck was always given access to and frequently took over-the-counter antacids (Tums and omeprazole) for stomach pain or related symptoms. ([Filing No. 32-2 at CM/ECF p. 7](#); [Filing No. 32-3 at CM/ECF pp. 58-60](#).)

10. On August 26, 2014, Beck submitted an inmate medical request form, in which he complained of "severe heart burn," chest pain, heart rate fluctuation, and "panic attacks." ([Filing No. 32-3 at CM/ECF p. 65](#).) Beck took Tums for the heartburn. ([Filing No. 32-2 at CM/ECF p. 7](#); [Filing No. 32-3 at CM/ECF pp. 59](#), 65.)

11. Beck did not submit any further inmate request forms regarding heartburn or acid reflux symptoms until October 29, 2014. ([Filing No. 32-2 at CM/ECF p. 7](#); [Filing No. 32-3 at CM/ECF pp. 63-97](#).) On October 29, 2014, Beck submitted an inmate medical request form, after regular business hours, which stated, "I am having severe acid reflux but I think I might have an ulcer, cause it burns and I am in severe pain from my chest to my stomach." ([Filing No. 32-2 at CM/ECF p. 7](#); [Filing No. 32-3 at CM/ECF p. 82](#).) Jail staff did not perceive the existence of any medical emergency, so they left Beck's inmate medical request form for Goldsby to address in the morning. (*Id.*)

12. By the next morning, October 30th, Beck had submitted an inmate grievance form that stated, "I am having severe pains in my stomach and having severe acid reflux with pain going from my throat deep into my stomach, I need to see a doctor if I get denied any kind of medical I will start a law suit." ([Filing No. 32-2 at CM/ECF p. 7](); [Filing No. 32-3 at CM/ECF p. 84]().)

13. Goldsby visited with jail staff about Beck. Jail staff reported to Goldsby that Beck had been eating all of his meals, was sleeping at night, was engaging in normal activity levels (including taking all opportunities to use the exercise yard and library), was taking his regular smoke breaks, and that they had not observed him to exhibit any outward signs of pain or distress during the regular well-being checks that were conducted at least hourly. ([Filing No. 32-2 at CM/ECF p. 7]().)[3] The reports were consistent with Goldsby's own recent personal observations. (*Id.*)[4]

---

[3] These statements from the jail staff, taken from Goldsby's affidavit, are not received to prove the truth of the matter asserted but rather to understand the impact of the words (whether true or not) on the listener. What Goldsby believed is relevant to both the subjective and objective components of Eighth Amendment jurisprudence regarding a claim of *deliberate* indifference to a *serious* medical need. "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form." *See* Rule 56(c)(2). *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012).

[4] Beck alleges that he "could barely eat or get out of bed for several days" during his 2014, four-month confinement period at the Custer County Jail. ([Filing No. 19 at CM/ECF p. 2]().) This conclusory allegation does not create a genuine dispute as to the personal observations of jail staff during the relevant time period, October 29th-30th. Importantly, Beck does not allege that he informed anyone or that anyone observed that he could "barely" eat or get out of bed. "[I]t is black letter summary judgment law that a conclusory, self-serving affidavit will not defeat an otherwise meritorious summary judgment motion." *Keiran v. Home Capital, Inc.*, 858 F.3d 1127, 1132 (8th Cir. 2017).

14. On October 30, 2014, Goldsby relayed, verbatim, Beck's October 29th inmate medical request form and October 30th grievance form, as well as information from jail staff about their recent observations of Beck, to Dr. Lawrence over the phone. ([Filing No. 32-2 at CM/ECF pp. 7-8](); [Filing No. 32-3 at CM/ECF pp. 82-85](); [Filing No. 32-4 at CM/ECF p. 3-4](); [Filing No. 32-5]().) Dr. Lawrence prescribed Beck the antacid medication Zantac, which is similar to other prescription medications she issued for him in the past to control his acid reflux symptoms, including stomach pain. (*Id.*)

15. Later that same day, October 30th, Goldsby personally delivered the Zantac to Beck for him to take the first dose. ([Filing No. 32-2 at CM/ECF p. 8](); [Filing No. 32-3 at CM/ECF pp. 82-85]().) Beck refused to take it without seeing a doctor and stated that he "could have a tumor." (*Id.*)

16. In her professional medical opinion, if Dr. Lawrence had known that Beck saw blood in his stool, her course of treatment still would have been to initially conservatively treat Beck with Zantac, and ask jail staff to monitor him and report back any worsening symptoms. Only if Beck's symptoms worsened or changed would she have scheduled him for an appointment to be seen. ([Filing No. 32-4 at CM/ECF p. 4]().)

17. According to Dr. Lawrence, acid reflux and heartburn are conditions that may be optionally treated in a physician's discretion to relieve patient discomfort, and as a preventative tool against possible complications. If left untreated, symptoms usually subside on their own, and a bland diet will usually assist in minimizing or avoiding symptoms. It is not usually absolutely necessary that acid reflux or heartburn be treated with medications, unless the patient is losing weight from being unable to eat, or if other related more serious medical conditions have developed. (*Id.*)

18. Because Dr. Lawrence was familiar with Beck's medical history, in her professional medical opinion, treatment of his complaints on October 29-30, 2014, was optional. (*Id.*)

19. After October 30, 2014, up until his transfer to Texas authorities on November 18, 2014, Beck did not submit any additional inmate medical request forms complaining of stomach pain or related symptoms. ([Filing No. 32-2 at CM/ECF p. 8](#); [Filing No. 32-3 at CM/ECF pp. 63-97](#).) During this time period, Goldsby did not see Beck exhibit any outward signs of being in physical distress, and he appeared to her to be eating, moving, and sleeping normally. ([Filing No. 32-2 at CM/ECF p. 9](#).) Beck was not losing weight. (*Id.*) Jail staff did not report any concerns about Beck to Goldsby. (*Id.*)

20. On one occasion in 2014, Beck approached Osmond in the cell area about his stomach hurting and requested to see a doctor. ([Filing No. 32-1 at CM/ECF p. 2](#).) Beck was standing upright speaking to Osmond at the time and did not appear to be in medical distress. (*Id.*) Osmond told Beck that he would let Goldsby know about Beck's request. (*Id.*) Osmond promptly spoke to Goldsby, who later advised Osmond that she called Dr. Lawrence and that Dr. Lawrence prescribed Beck medication that he refused to take. (*Id.*)[5]

21. On November 18, 2014, Goldsby was personally present when Beck left with Texas authorities. She did not see Beck exhibit any signs of physical

---

[5] These facts are largely consistent with Beck's allegation that "Sheriff Dan Osm[o]nd came back into the cell block to check on a maintenance report and I was able to stop him and explain my situation. Dan Osm[o]nd just referred me back to Pamela [Goldsby] the head jailor." ([Filing No. 19 at CM/ECF p. 2](#).) Beck's allegations that "[a]t that point the Sheriff knew how much pain I was in" and "Dan Osm[o]nd is also at fault because he seen the condition the plaintiff was in and refused to do anything about it," (*Id.* at CM/ECF pp. 2-3), are conclusory and speculative and do not create a genuine dispute as to Osmond's personal observations of Beck during their one encounter and Osmond's prompt discussion with Goldsby about Beck's request to see a doctor.

distress. From her past experience, she knows that law enforcement from other agencies will generally not accept transfer of custody of an inmate/detainee who appears to be or claims to be in acute medical distress, without demanding clearance to confine through a medical examination. The Texas authorities did not voice any concerns about taking Beck into their custody. ([Filing No. 32-2 at CM/ECF p. 10](#).)

Disputed amongst the parties is whether Beck informed Goldsby that he saw blood in his stool. Beck claims he told Goldsby that "I have seen blood in my stool." ([Filing No. 19 at CM/ECF p. 3](#).) Goldsby claims that, when asked, Beck denied seeing any blood in his stool. ([Filing No. 32-2 at CM/ECF p. 8](#).)

### III. ANALYSIS

**A. Standard of Review**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [Fed.R.Civ.P. 56(a)](#). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *[Schilf v. Eli Lilly & Co.](#)*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *[Dancy v. Hyster Co.](#)*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *[Moody v. St. Charles Cnty.](#)*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *[Gregory v. City of Rogers](#)*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *[Id](#)*. Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a

8

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B. Exhaustion**

Defendants argue that they are entitled to summary judgment because Beck failed to exhaust available administrative remedies prior to filing this § 1983 action. The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). To satisfy the exhaustion requirement, a grievance must alert prison officials to the claims the plaintiff has included in the complaint, but need only provide the level of detail required by the grievance system itself. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007). The purpose of the exhaustion requirement is to give officials "time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). Administrative exhaustion is an affirmative defense that defendants have the burden to plead and prove. *See Jones*, 549 U.S. at 218-19.

Defendants' evidence shows that the Custer County Jail has a grievance procedure that merely requires an inmate to write his or her complaint on an inmate request form. (Filing No. 32-3 at CM/ECF p. 141.) There is no dispute that Beck pursued all available administrative remedies at the Custer County Jail because he submitted an inmate request form about his "severe acid reflux" and stomach pain. (*See* Filing No. 32 at CM/ECF p. 30.) Instead, Defendants argue that Beck failed to exhaust his administrative remedies under the Nebraska Political Subdivisions Tort Claims Act ("PSTCA") before filing this action.[6] However, the United States Supreme Court has stated:

---

[6] Defendants cite *Cole v. Isherwood*, 716 N.W.2d 36 (Neb. 2006) for support. In *Cole,* the Nebraska Supreme Court concluded that "Cole filed his §

9

> In *Woodford* [*v. Ngo*], we held that to properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules," [548 U.S. 81, 88 (2006)]-rules that are defined not by the PLRA, but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Jones*, 549 U.S. at 218. Beck complied with the Custer County Jail grievance procedures and that "is all that is required by the PLRA to 'properly exhaust.'" *Id.*

## C. Qualified Immunity

Defendants argue that they are entitled to summary judgment because they are immune from suit in their individual capacities under the doctrine of qualified immunity. "Qualified immunity shields government officials from liability for civil damages and the burdens of litigation 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Stated another way,

---

1983 claims prematurely because he did not exhaust his state tort claims before *filing* his § 1983 action." 716 N.W.2d at 43. (emphasis in original) In other words, to comply with the PLRA exhaustion requirement, Cole was required to exhaust his administrative remedies under the Nebraska State Tort Claims Act before filing his § 1983 action. *See id.* at 42-43. The court finds *Cole* distinguishable, most importantly, because the Nebraska Department of Correctional Services informed inmates that, as part of its grievance procedure, they may file a tort claim under the State Tort Claims Act. *See Cole v. Isherwood*, 653 N.W.2d 821, 828 (Neb. 2002) (citing *Pratt v. Clarke*, 604 N.W.2d 822 (Neb. 1999)). The Custer County Jail does not.

qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information that the defendant possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation and citation omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity requires a two-part inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). If no reasonable fact-finder could answer yes to both of these questions, the official is entitled to qualified immunity. *Id.* "Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009).

At the time of the alleged constitutional violation, Plaintiff was a pretrial detainee awaiting extradition to Texas. Because Plaintiff was a pretrial detainee, his deliberate indifference claim is analyzed under the Fourteenth Amendment's Due Process Clause. *See Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017). The standard applied in this context "borrow[s] from the Eighth Amendment deliberate-indifference standard applicable to claims of prison inmates." *Id.* (quoting *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016)). To prevail under the Eighth Amendment, Plaintiff must demonstrate that (1) he suffered from an objectively serious medical need, and (2) Defendants knew of, but deliberately disregarded, that need. *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016). "A medical condition is 'objectively serious' if the prisoner was diagnosed by a doctor or it is so obvious that a lay person would recognize the medical need." *Id.* "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more ... than gross negligence. It requires a mental state akin to criminal recklessness." *Id.* (internal quotation marks and citations omitted).

The undisputed facts show that Beck did not suffer from an objectively serious medical need. During his 2014 period of confinement at the Custer County Jail, Beck was not diagnosed by a physician as *requiring* treatment, rather, his treatment was optional according to Dr. Lawrence. Therefore, Beck's condition must have been so obvious that a layperson would easily recognize the need for medical treatment. The Eighth Circuit Court of Appeals has found a serious medical need that was obvious to a layperson where an inmate: was pregnant, bleeding, and passing blood clots; had swollen and bleeding gums and complained of extreme tooth pain; experienced excessive urination, diarrhea, sweating, weight loss, and dehydration related to known diabetes; or exhibited signs of early labor and her medical records clearly documented a history of rapid labor and delivery. *See Jones v. Minn. Dept. of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008) (internal citations omitted).

Beck's symptoms do not rise to the level of the inmates' symptoms in those cases where the Eighth Circuit has found a serious medical need that was obvious to a layperson. Beck had stomach pain and "severe acid reflux" that, according to him, resulted in blood in his stool. He does not allege the frequency or severity of blood in his stool. Nevertheless, Dr. Lawrence opined that she would not have changed her course of treatment for Beck even if she had known that he had blood in his stool. Further evidence that Beck did not have an objectively serious medical need was that jail staff did not observe any signs of medical distress from Beck. Perhaps most telling, Beck refused to take prescribed antacid medication to relieve his discomfort – discomfort that jail staff had successfully relieved for Beck in the past with similar antacid medications. "The prison officials' background knowledge is part of the analysis" of "whether a medical need is sufficiently obvious." *Id.* And, Beck does not allege any medical issues since October 30, 2014, despite the alleged lack of medical treatment. Accordingly, Beck fails to show that he suffered from an objectively serious medical need.

Alternatively, even if Beck suffered from an objectively serious medical need, he fails to show that either Goldsby or Osmond was deliberately indifferent

to that medical need. For Osmond, Beck "must allege and show that the supervisor personally participated in or had direct responsibility for the alleged violations" or "that the supervisor actually knew of, and was deliberately indifferent to or tacitly authorized, the unconstitutional acts." *Saylor*, 812 F.3d at 644 (citation omitted). Beck fails to show that Osmond was involved in, or directly responsible for, his alleged insufficient medical care. Osmond was not generally present for or involved in the day-to-day activities at the Custer County Jail. On one occasion Beck informed Osmond about his stomach hurting and requested to see a doctor. During this encounter, Beck was standing upright and did not appear to Osmond to be in medical distress. Osmond promptly informed Goldsby, who oversees the day-to-day activities of the Custer County Jail, of Beck's request to see a doctor. This evidence does not show that Osmond knew or had a reason to believe that Beck later received insufficient medical care. *See id.*

Similarly, Goldsby consulted with jail staff upon learning of Beck's October 29th and 30th complaints. Jail staff did not express any concerns about Beck to Goldsby, and their personal observations of him correlated with Goldsby's own that Beck did not appear to be in medical distress. In fact, according to their observations, Beck exhibited normal behavioral and activity levels. Still, Goldsby called Dr. Lawrence and read to her Beck's request and grievance forms verbatim. Later that same day, Goldsby attempted to give Beck his first dose of Zantac, which Dr. Lawrence prescribed to Beck after her discussion with Goldsby. Based upon Beck's medical history, Goldsby had no reason to doubt Dr. Lawrence or that prescription antacid medication would relieve Beck's "severe acid reflux" and stomach pain. *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) (citation omitted) ("Prison officials cannot substitute their judgment for a medical professional's prescription.").

If Beck did indeed suffer from an objectively serious medical need, Goldsby and Osmond did not exhibit deliberate indifference to that medical need. They were aware of Beck's medical need and took steps to meet it. *See Saylor*, 812 F.3d at 645. They had no reason to believe that prescription antacid medication from Dr.

Lawrence was inadequate to treat Beck's "severe acid reflux" and stomach pain, and frankly, no one will know because Beck refused to take the medication. Beck's refusal to take the medication evidences a case of disagreement with treatment and "mere disagreement with treatment decisions does not rise to the level of constitutional violation." *See Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

Accordingly, the court finds that Beck's deliberate indifference claim against each Defendant fails as a matter of law. "If the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed.... This is not to say, however, the defendant official is entitled to qualified immunity. Rather, if no constitutional violation occurred, plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of the § 1983 claim." *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3. (8th Cir. 2007) (citations omitted). Alternatively, because there was no constitutional violation, each Defendant is entitled to qualified immunity. *See Payne v. Britten*, 749 F.3d 697, 707 (8th Cir. 2014) ("For example, a district court could begin and end with the first question, granting qualified immunity because there was no constitutional violation.").

IT IS THEREFORE ORDERED that:

1. Defendants' Motion for Summary Judgment (Filing No. 31) is granted.

2. Plaintiff's Motion for Appointment of Counsel (Filing No. 35) is denied as moot.

3. A separate judgment will be entered.

Dated this 12th day of September, 2017.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge